UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES ) ) ) ) ) ) ) ) KARL THOMSON ) ) ) | Cr. No. 04-10112-RGS |

**KARL THOMSON'S SENTENCING MEMORANDUM**

**I. Introduction**

Karl Thomson comes before this Court to be sentenced for his role in aiding and abetting the sale of <u>one gram</u> of crack cocaine on August 14, 2003. For this crime, Mr. Thomson faces a sentencing range under the United States Sentencing Guidelines of 188-235 months incarceration.

Mr. Thomson respectfully submits this memorandum in order to provide information to assist the Court in fashioning a sentence "sufficient, but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. § 3553(a) in light of <u>United States v. Booker</u>, 125 S. Ct. 738 (2005); <u>United States v. Jimenez-Beltre</u>, 440 F.3d 514, 2006 WL 562154 18-19(1st Cir. Mar. 9, 2006)(en banc)(Torruela, concurring)("Finally, I think it is of critical importance that the majority opinion be understood to reinforce our commitment to the statutory requirement that, in all cases, district courts must impose sentences that are "sufficient, but not greater than

necessary" to effectuate the goals of criminal punishment, as articulated in 18 U.S.C. §3553(a). In articulating its reasons for imposing any sentence, the district court must make clear reference to this central principle.")

*Booker* restored the district courts' historic function and ability to fashion a sentence tailored to the individual circumstances of the case and defendant before it by requiring courts to consider factors other than the sentencing range prescribed by the United States Sentencing Guidelines. United States v. Pho, 443 F.3d 53, 61-62 (1st Cir. 2006) ( 18 U.S.C. §3353(a) factors to be considered include "the nature and circumstances of the offense and the history and characteristics of the defendant," "the need for the sentence imposed," and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,".) In fact, under Section 3553(a), courts are required to sentence below the guideline range if such a sentence would be sufficient to achieve the statutorily proscribed purposes of punishment.

Mr. Thomson was arrested on April 15, 2004, and has spent the last 32 months incarcerated at the Plymouth County House of Correction. He moves the Court impose a sentence of 60 months incarceration, with a term of supervised release requiring drug treatment, a two hundred dollar special assessment and no fine. Such a sentence is justified by the facts of this case, and is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in 18 U.S.C. § 3553(a) (2), United States v. Booker, 125 S.Ct. 738 ( 2005). Under the circumstances of this case, which include Mr. Thomson's personal history and characteristics, and his minor role in the

offense, the very small amount of drugs involved, the proposed sentence is just, reasonable, sufficient and not greater than necessary.

### III. Argument

Following the Supreme Court's decision in United States v. Booker, 125 S.Ct. 738 (2005) a court must look to 18 U.S.C. § 3553(a), and impose a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in § 3553(a)(2). Booker 125 S.Ct. at 764-65. In imposing sentence, the Court must consider all of the factors set forth in § 3553(a)(1)-(7), United States v. Smith, 445 F.3d 1, 5-6 (1st Cir. 2006)

    1. Mr. Thomson's personal history and characteristics, and the nature and circumstances of the offense. (§ 3553(a)(1))

a) Mr. Thomson's personal history and characteristics

Mr. Thomson is soon to be 43 years old, and has suffered from drug abuse problems since his late teens. (Presentence Report at Paragraph 115; hereinafter citations to the Presentence Report will be referred to as "PSR at ¶__") He was born in Boston, and grew up in a neighborhood where violence was the norm and where the sound of gunshots was part of the aural landscape (PSR at 74). His parents remained together until he was 15 or 16 years old (PSR at ¶77).and though he characterizes his relationship with his mother as good, his father, who abused alcohol heavily, was often physically and verbally abusive (PSR at ¶76).

Despite this rough upbringing, Mr. Thomson finished and graduated from high school in 1983, and in 1985 began eight years of working as a child-care worker with teenagers at Hillside Shelter Care, a job he "greatly enjoyed" (PSR at ¶ 124, 135).

Unfortunately, Mr. Thomson's off-hours substance abuse problems continued to escalate and resulted in drug arrests and unemployment by the early 1990's. As time went by, his abuse turned into addiction, and he was drinking heavily, using crack cocaine and eventually heroin. He was using crack cocaine, heroin and alcohol on a daily basis until his arrest on the present charges. (PSR at ¶¶ 113-117).

His drug addiction left him living at home cared for by his mother, taking odd jobs as he could find them, and scrounging for drugs as he could. In was in this context that the offense described below transpired.

 b) <u>The nature and circumstance of the offense</u>

As set forth in the offense conduct section of the Presentence Report, Mr. Thomson was one of a number of individuals arrested after local police and federal drug agents targeted an inner-city neighborhood in Boston. Law enforcement officers, posing as drug customers, made a series of purchases from individuals selling crack near Copeland Street and the Warren Gardens Housing Project. On August 14, 2003 an undercover Boston Police Officer approached Mr. Woldeslassie, from whom he had previously purchased crack cocaine, and attempted to make a purchase. (PSR at ¶14) Mr. Woldeslassie told the undercover that he didn't have anything for sale at the moment and to return later. The officer asked him who had cocaine to sell right then and Woldeslassie, knowing Karl Thomson from the street as an addict and someone who would know who might be selling, directed the undercover to go ask him. <u>Id</u>.

The officer approached Mr. Thomson, and Mr. Thomson asked him what he was looking for, and the undercover officer told him he wanted to buy crack cocaine. One of the dealers on the street, Steven Walker, then 17 years old, saw Thomson speaking with

the undercover. Because Walker had sold crack cocaine to the undercover on a previous occasion (PSR at ¶14), and believed him to be a drug customer, he ran up to Mr. Thomson and asked him what this "customer" was looking for. Mr. Thomson told him, and Walker told Mr. Thomson to stay with the undercover while Walker went to get him what he wanted. (Walker asked Mr. Thomson to stand with the "customer" so that the "customer" wouldn't be approached by another dealer or go looking for someone else to buy from while Walker was retrieving the drugs.) Within a few minutes, Mr. Walker returned, took the undercover into a hallway, and sold him one gram of crack cocaine. After the undercover officer left the hallway, Mr. Thomson went in and Mr. Walker gave him, to Mr. Thomson's best memory, a small amount of drugs, as an expected gratuity for standing with the customer while Walker went to retrieve the drugs.

Mr. Thomson wasn't out on the street that day selling drugs. He wasn't in the drug business and couldn't have been if he had wanted to. Basic economic rules define the drug trade as they do legitimate businesses. Mr. Thomson had no money with which to buy drugs to resell, and because he was an addict, no dealer would "front" him drugs to sell, as they reasonably feared he would consume the product rather than sell it and repay them. Throughout an investigation spanning months (Mid-June to late November 2003 (PSR at ¶3) which resulted in the 47 controlled purchases from 24 individuals, Mr. Thomson is only charged with the single incident of assisting Mr. Walker occurring on August 14, 2003. None of the hundreds of pages of discovery describes Mr. Thomson engaging in any other drug transactions, and in fact he is barely mentioned. As the Offense Conduct submitted by the government states: "The government advises that is

5

has no further evidence of Karl Thomson's involvement in the instant conspiracy" (PSR at 21)

    2.  <u>The need for the sentence  a)"to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense", b) "to afford adequate deterrence to criminal conduct", c)  "to protect the public from further crimes of the defendant", and d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner" (§ 3553(a)(2)(A-D))</u>

    All offenses offense involving the distribution of narcotic drugs are "serious". That said, the amount of drugs involved in the present offense is rarely seen in a federal prosecution.  Moreover, Mr. Thomson never actually had possession or control over the gram of cocaine, nor actually distributed it, or hired, counseled, or ordered anyone else to.  He acknowledges that by telling Mr. Walker what the "customer" was looking for, and standing with the customer while Mr. Walker retrieved the gram of cocaine, he aided and abetted the distribution of crack cocaine.  Furthermore, his actions can be legally viewed as having "used" Mr. Walker (a juvenile) to commit a drug crime, despite the fact that common sense might view Mr. Walker as having used Mr. Thomson.  Lastly, the hallway in which Mr. Walker consummated the sale was a protected area, within a thousand feet of a playground.  It can be safely noted, however, without fear of contradiction by the government, that most if not all of the land encompassing the City of Boston lies within a protected area, i.e., "within one thousand feet of real property comprising a public or private elementary , vocational, or secondary school or public or private college, junior college or university, or a playground, or housing facility owned

6

by a public housing authority, or within 100 feet of a public or private youth center, public swimming pool or video arcade" 21 U.S.C. §860(a). The decision to charge Mr. Thomson with a violation of the "school zone" statute has perhaps more to do with prosecutorial discretion than it does the facts of this particular case, for in fact virtually all drug violations occurring within the City of Boston or other heavily developed urban areas could so be charged.

     A sentence of 60 months adequately reflects the seriousness of the present offense, promotes respect for the law, and provides substantial deterrence, both to Mr. Thomson, should he ever contemplate re-offending and to others in the community who commit like crimes. It is respectfully suggested that a sentence promotes respect for the law when it is commensurate with the crime. In other words, respect for the law is not the equivalent of fear of punishment, and Draconian sentences may serve as deterrents, but do not engender respect.

     The root of Mr. Thomson's criminal behavior is his drug addiction. Long term institutionalization of Mr. Thomson, who is 43 years old is simply not the answer. The proposed sentence of 60 months will allow him to take advantage of drug treatment programs offered by the Bureau of Prisons. But to provide rehabilitation and treatment in the "most effective" manner, and prevent relapse, the treatment program should be closely followed by supervised requiring steady employment and monitored out-patient relapse prevention counseling and testing. A term of supervised release can provide exactly the "carrot and stick" necessary to accomplish these goals. As the Court is aware, a "Drug Court" has been established in this District, wherein the Probation Department and Magistrate Judge Sorokin provide close supervision for "former" addicts on

supervised release. The proposed term of incarceration followed by a term of supervised release will provide Mr. Thomson with the assistance and incentive to successfully address his drug addiction, and remake the life it has wrecked.

    3.  <u>The "kinds of sentences available", the "kinds of sentence and sentencing range" established under the Guidelines and "any pertinent policy statement" (§ 3553(a)(3)-(5))</u>.

Mr. Thomson is facing a one year minimum mandatory sentence (PSR at ¶146), and as noted, he has been incarcerated for approximately 32 months. His guideline range is 188-235 months due to the fact that he has been classified as a career offender; without the career offender enhancement, his guideline range is 51 to 63 months. The sentence proposed of 60 months is at the high end of that range, but would constitute a departure and/or variance from the established Guideline range. U.S.S.G. §4A1.3 states that there may be cases where a defendant's criminal history significantly over-represents the seriousness of the defendant's criminal history or the likelihood the defendant will commit further crimes. In such circumstances the Court may depart downward from the guideline range

The career offender designation was designed to provide lengthy sentences for "repeat violent offenders and repeat drug traffickers" S.Rep.No. 98-225, 98th Cong.,2d Sess. 175 (1983). While the present offense qualifies as a drug felony, it is somewhat a stretch to characterize it as a "drug trafficking crime". Mr. Thomson's record of criminal convictions consists two distribution cases dating back to 1993, and four drug possession charges. While records for the cases are unavailable, upon information and belief, the distribution charges involved relatively small amounts of drugs, and were consolidated

for sentencing, where Mr. Thomson was offered a one year suspended sentence in exchange for a guilty plea.[1]

Mr. Thomson's sole conviction for a crime of violence involved an altercation Mr. Thomson had with his nephew. The nephew had threatened Mr. Thomson, and Mr. Thomson picked up a shovel to defend himself, but never used it as a weapon. Police arrived and told the parties to calm down; when some very minor pushing ensued, Mr. Thomson was arrested. He was unable to make bail and pled out so as to be released when he was brought to Court.

Mr. Thomson's criminal record is the record of an addict: small time drug offenses, mostly possessory, with a single assault and battery conviction. True, no city wants alcoholics, drug addicts or homeless people as part of its citizenry, but long term incarceration of such individuals as "career offenders" is not what Congress intended. Moreover, it is not what is required by *Booker*, i.e., that a sentencing court must look to 18 U.S.C. § 3553(a), and impose a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in § 3553(a)(2).

4.  <u>The "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (§ 3553(a)(6)).</u>

As noted, <u>supra</u>, 24 individuals were charged with drug distribution offenses as a result of the instant investigation. One of those individuals was the co-defendant Justin Teal, who was also classified as a career offender. This Court sentenced Mr. Teal to a sentence of 120 months. The difference between Mr. Teal and Mr. Thomson was that Teal was actually out on the street selling drugs, and readily sold them to the undercover

---

[1] It should be noted that under Massachusetts law, distribution offenses involving amounts as low as 14 grams of cocaine carry a 3 year minimum mandatory sentence. MGL c 94C§32E(b)(1).

9

agent when approached. As is clear from Paragraph 12 of the Presentence Report, defendants Worrell, Woldeslassie and Teal worked in concert, with Teal being the individual who kept the packages of crack cocaine in his mouth. Mr. Thomson is clearly less culpable than Mr. Teal, and his sentence should so reflect. In fact, based upon a review of the discovery, it appears Mr. Thomson is the only one of the indicted defendants who was not actively engaged in the distribution of drugs. Moreover, in comparison to other defendants prosecuted in federal court on drug distribution charges, and who qualify as career offenders, and in the experience of undersigned counsel (and, with due respect, it is suggested in this Court's experience as well), the case at bar is certainly outside the "heartland" of drug distribution or conspiracy prosecutions, both in terms of the amount of drugs involved and the actions of the defendant. (Mr. Thomson entire involvement in this drug case lasted for no more than a few minutes, and from the evidence appears to be without premeditation). The relatively unique circumstances present here distinguish this case from the norm, and the sentence should so reflect that reality.

## IV.  CONCLUSION

A sentence of 5 years in prison and a term of supervised release is a severe sentence for what Mr. Thomson did. It certainly sends the message that the Court or society condemns such behavior, and transgression carries a heavy price. But it is also reasonable in terms of the facts of this case, and the statutory factors set forth in 18 U.S.C. 3553(a), and a longer sentence is not necessary to achieve those sentencing goals. Mr. Thomson wants his life back, but not the life of an addict. He has been drug free for

over two and a half years, and wants to stay that way.  He prays this Court exercise its

discretion, and adopt the sentence proposed herein.

                              Respectfully Submitted,
                              Karl Thomson
                              By his attorney

                              /s/ Michael C. Andrews

                              Michael C. Andrews
                              21 Custom House Street
                              Boston, Massachusetts 02110
                              (617) 951-0072
                              BBO# 546470